All right, our fifth case for this morning is Brown v. the Chicago Board of Education. Brown v. the Chicago Board. Mr. Flynn. Thank you, Your Honor, and may it please the court and right it's not Topeka. I think it would be the wrong circuit. I think it would be appropriate with regard to this case to begin with the words of a sixth grader. The sixth grader from Mr. Brown's class on the day in question was interviewed by the principal and this is in the notice of pre-discipline hearing that the first time that Mr. Brown was informed there was going to be an issue about the October 4th conduct, 13 days later. Principal Mason states, one student from Mr. Brown's sixth grade class that was present during the time in question stated that a student wrote a mean poem about another student and that Mr. Brown read parts of the poem aloud and further discussed the problems of bullying. Well, the reason why I started with this is this sixth grader got it. What was Mr. Brown doing? He was attempting to tell his students, as he is mandated to do, that bullying is out of bounds and that this constituted bullying. In other words, he was performing brilliantly, I believe, his educational duties and this is mandatory as discussed by CPS's attorney with Mr. Brown in his deposition. Well, I have to say, look, bullying is terrible. It's a big problem in the schools. I'm sure Mr. Brown has had to deal with it before as an experienced teacher, but what the school was concerned about was the language that he was using and, in particular, the racially charged language in the course of having that discussion with such young children. And maybe you would have had a different policy as principal or a different policy as the Chicago Board of Education, but we need to know that the policy that they had was not just ill-advised, perhaps, but actually unconstitutional and that's where I think you need to focus your remarks. Thank you, Your Honor. Obviously, the major issue in this case is the as-applied vagueness argument and the as-applied vagueness argument boils down to the two words, fair warning. Did Mr. Brown have fair warning that repeating the word of the bullying note, which he is bullying that he is supposed to that repeating that word and sensitizing the students that that word was inappropriate, to say the least, insensitive? What do you think would have been sufficient notice? Do they have to have a list? Well, if they had a list of prohibited words, that would certainly take care of the Fifth Amendment, fair warning. I'm sure you remember George Carlin's routine about the words you can't say on television, right? I certainly do. I radioed it, wasn't it? But surely a list is not required, is it? I don't think a list is required. Okay, what would it take to have provided fair warning, do you think? Well... What's the minimum that would have been needed? I think examples of when you can and cannot use words. So, for instance, in the melange of rules that are involved in this case, 3-3, 3-17, 4-2, they use euphemisms, they don't use specifics, they use the term verbally abusive. Mr. Brown was supposed to have been verbally abusive to a student. So, but your position has to be that it's unconstitutional for a school district to take the position that there are certain words, and the one used here that we're focused on, I would have imagined would have been at the top of any such list that Judge Hamilton's imagining, that just can't be used. You have to use a euphemism, especially with children that young. You're not talking about college-age people, you're not talking about adults, you're talking about sixth-graders. And again, you know, I'm trying to stay away from whether that would have been my policy or yours, but is it an unconstitutional policy for them to say, our goal is for that word never to be uttered in the school. Do we bat a thousand? Maybe not, but the goal is it never belongs in the school. Well, that would have been an answer to Judge Hamilton's question. I will quote you, Judge Wood, that would be a perfect statement of policy by the school district. That word shall never be used in any context whatsoever, including when you're teaching Huckleberry Finn, in which one of the main characters is named that, including... But he wasn't teaching Huckleberry Finn. Excuse me? It was at a different Chicago public school. I don't even know what age group he was teaching Huckleberry Finn to. It was at a different... No, he wasn't teaching it that day, but the point is that we have, we have a, what we call, this is a sub-rejuvenant motion. We have a disciplinary person from the school board, a 30B6 witness, who says, no book containing, novel, play, whatever, containing those words, and not just the word involved here, but a number of them, no book can be taught. Well, we have the affidavit of... That's ridiculous. It's a stupid rule, if that's what they're doing, of course. We can all list books, the late Harper Lee, etc.  I know. And what we have, of course, is a question of fact, to that point, created by the affidavit of the 15-year librarian at Murray School, Ms. Holzhauer, who lays out, this is at 99 for the record, who lays out the popular and assigned books and plays in CPS libraries that contain the N-word, I'm quoting from her affidavit, include the following, and of course they are, to kill a mockingbird, Native Son, Adventures of Huckleberry Finn, etc. So, the point being, fair warning, if we have a disciplinary person from the CPS saying you can never even teach the book, and we know the books are taught and they're assigned, how does Mr. Brown know when he, in fact, had taught Huckleberry Finn, it was in his lesson plans, granted, a different school, a different time, a different principal...  He's a Bret Hart, which is also in Hyde Park, and also goes up the 6th grade. Also, Your Honor, the 30B6 witness, Mr. Krieger, says it doesn't matter, K-12, there is no exception for age. This becomes an absurdity. And it's the absurdity that shows us that there's, at a minimum, a constitutional implication here regarding fair warning. Mr. Flynn, on the due process fair warning issue, could you address the Supreme Court's ruling in Arnett against Kennedy, which said that such cause as will promote the efficiency of the service gave sufficient due process warning on grounds for termination? Well, certainly certain policies and procedures in due process have to, in terms of the due process, have to be taken on their own. I do not think that the efficiency here is served, and I don't think... That's a policy disagreement. I'm saying, my concern is that the Supreme Court, and five justices joined that part of the opinion, said that was good enough to avoid a due process void for vagueness problem. How do we avoid that here? Well, I think you avoid it by relying on Granite versus Rockford, and FCC versus Fox. Granite is a criminal case, right? It is. It's a city order. And FCC is a regulatory case. It's a regulatory case. As opposed to employer-employee, which is the context we have here. That's correct. And I know you do not sit as a super personnel department. Let me say that repeatedly. More than once you've said that. But, at the same time, you are the guardians of constitutional protections, even to school teachers, and even to Mr. Brown, to be warned that the use of the word in one instance, when he is telling them not to use it, was in some... that he runs afoul, in some manner, of being verbally abusive, of using racially inciting language, of seriously disrupting the class, when Principal Mason said there was no disruption. Well, the policy doesn't require a disruption. I'm sorry, it does, Your Honor. Only one section of the policy requires a disruption. The 3.3, as I understand it, or 3-3, which is one of the rules that your client was disciplined under, applies any time a teacher uses verbally abusive language in front of the classroom, in front of students, and not even directed at a student. I'm not sure I heard you correctly. 3-3? 3-3. That prohibits using verbally abusive language in front of students. It doesn't matter if they're directed at the students. It doesn't matter if it actually creates a disruption. It's punishable. Group 3 acts of misconduct includes the following acts that disrupt the orderly educational process, and disrupt is in italics in the original. That governs all of Group Misconduct 3, which governs 3-3 and 3-17. So disruption is required. Is that descriptive or is that an element?  Is that descriptive or is that an element? You could read that to say that the school board has made the determination that the use of such language in front of the students is inherently disruptive, even if they're not getting rowdy or shouting in the classroom or otherwise misbehaving. I know we can get into Scalia-Stevens' question about the Second Amendment, but I didn't follow it then and I'm not going to follow it now. We don't need to go there. That's beyond our job today. But what I will say is that when 3-3 says misconduct includes the following acts that disrupt, disruption in italics, the orderly educational process, it seems to me to be an element of the charge. And that's true for 3-3, 3-17, and 4-2. All right. I'm going to have to ask you to sit down. We've asked you a lot of questions. I'll give you a minute if you need it. Thank you, John. And we'll hear from you, Ms. Lowder. Almost good afternoon. Counsel, may it please the court. In fact, Mr. Brown himself admitted there was a disruption. He said that when he started the discussion, it quickly devolved into some of his students calling cab drivers Muslim and Hispanic cab drivers derogatory names. So he himself admitted there was a disruption. And I don't think that's required under 3-3. It certainly disrupted the learning for the day because it took up two-thirds of the class period. Exactly, 40 of the 60 minutes. So whether the students became rowdy or agitated really doesn't matter. This took up 40 minutes of a 60-minute period. It was a grammar lesson we were supposed to be having that day about positives. And instead, it ended up a discussion about... So why didn't the principal who was present, if this was so troubling, why didn't he intervene at the time and he waited two weeks later to issue a notice? That's a good question, and I think he had a really good answer to it. He said he really had never faced this before. He'd never heard any other teacher say nigger in a classroom. So he wanted to think about how he should discipline this person. And he said he wanted to make sure that he put it in writing in a formal charge that Mr. Brown could have his union representative present when he responded to it. But he didn't think to stop it? He said he usually doesn't stop things. He goes into the classrooms all the time. He said he usually doesn't stop them, that's not his habit. And he didn't want to just stop it when he hadn't had time to think about it and think through it. He also, four minutes into the class discussion, got called away. So four minutes after this started, he was called back to the office and he didn't come back for, I think, five minutes. And then he said they were on to a different topic. It does make you think, though, that he didn't think it was urgent. I'm sure there's some things he would have stopped, and he chose not to stop this. And so, you know, if you put yourself in Mr. Brown's shoes, when maybe the students are seeing the movie Red Tails, or they, you know, in the school library are some of the books that were mentioned, may not be a pretty part of our national life, but it's a part of our national life, and they're exposed to it. How would he have known that frank discussion in the classroom, that in no way endorses the use of language like that, was so strongly forbidden that he was going to be suspended for five days without pay? Well, because the Employee Discipline Code says don't use verbally abusive language in front of students. I don't know how we could make it more clear than that. So what do you tell the high school English teachers who are teaching Huckleberry Finn? Well, our Employee Discipline Code doesn't apply to works of art. It doesn't say what works of art can say. And I don't believe that Mr. Krieger said we couldn't teach those. What he said is you can't say that word when you're teaching them. You're rolling your eyes. I am, yes. I don't think he said that you can't teach them. This policy, I've got to say, looks... If I am going to be a super personnel department, this is a terrible overreaction. Well, I don't think it was, because I think that he had noticed what was prescribed, and he decided to go off on a frolic and detour. He was there to teach positives, not to teach about anti-bullying. He doesn't claim that our anti-bullying policy talks about... Black people can use the term, but they get mad when white people do, or that black characters are killed off first in movies. Is that part of our curriculum? If he's saying he's teaching the anti-bullying curriculum, what part of that did he teach? I'm a little confused. There was no teaching of the anti-bullying curriculum that I can see. Instead, whatever he was teaching caused his 11- to 13-year-olds to feel that they had license to begin calling other racial and religious groups names. He wasn't prepared to do this lesson. He says himself he had never used the word in class before, except when he was teaching Huckleberry Finn, and in that situation he had a lesson plan. He said he's never taught a lesson plan on racially charged language. He's taught in five different schools, and he's never heard of another teacher who taught such a lesson. He wasn't prepared to teach that lesson, and I think that that's your answer. I think that he was required by this court's precedent in Palmer from 1979 and in Webster the following year to hew to the prescribed curriculum because it's the school district who sets that curriculum by state law, and it can require adherence to it by its employees. Right, and that's the First Amendment. That resolves the First Amendment question, but we do have the due process vagueness challenge, and he's claiming that he didn't have fair notice that this abusive language rule would be applied in this context when he wasn't directing the epithet at students. He was using it as a teaching moment or trying to. All right. Well, his own behavior shows that he knew this was inappropriate because he says that when he said, well, I hesitated to say the word, I asked the students to trust me. So the district court found he knew he was treading on sensitive territory. But sensitive is one thing. In violation of the school's policy is another, and whether the school's policy goes so far as to, say, prohibit reprimanding a student for uttering the forbidden word and saying, I never want to hear you say X again, I can imagine a lot of people would think that the school policy doesn't prohibit that, and yet it sounds like that's what he, you know, he thought that's what he was disciplined for. Also, when he began, he was reading the note, and he said he came to those words that we're talking about, and he said, I didn't read them, of course. So he knew. And then the kids in the class were saying, please, go ahead and read the note. And he said, no, I don't read or I don't say morally offensive words or words that are racially stereotypical. That shows that he knew that what he was saying was inappropriate. So unless you have further questions, I'd ask you to affirm the word of summary judgment to the board. All right, thank you very much. So I said I would give you another minute, Mr. Flynn, if you would like it. Thank you very much. Counsel said he was on a frolic and detour. That's why I started with the bullying point. They keep on saying that, but there is a charter point to the CPS that says, intervene when you see bullying and stop it. And that's in his deposition at page 113, part of the record. Secondly, they talk about deviating from lessons plans. Well, that's not what he was charged with. He was charged with verbally abusing students, using verbally abusive language. He was charged with and stated, do not use the word and, this is the principal's point, do not use the word and dash, dash, dash, with students at Murray at any time. Nothing to do with lesson plans, nothing to do with so-called frolic and detour. Finally, Mr. Krieger at record 97, it's in the reply brief at pages five and six, is asked, so from your perspective as sitting here as a 30B6 witness for the Board of Education of the City of Chicago, is it your testimony that teaching any book that uses the word nigger would violate 4-2, is that correct? There's an objection inserted. The witness, yes. It's teaching the books as well that their 30B6 witness says is violative of this melange of rules. There has been no fair notice given to Mr. Brown, and I would ask you to reverse the summary judgment at a minimum, the basis of the questions of fact between the librarian and Mr. Krieger, between the principal and Mr. Brown. I thank you very much. If there are no further questions. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.